**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Higgs Trucking, LLC, and John Higgs,<br><br>Plaintiffs,<br><br>v.<br><br>Express Auto Transport, Inc., and Richard Bailey,<br><br>Defendants. | Case No. 25-cv-2332-EMB<br><br>**Opinion and Order** |

John Higgs owns a trucking company, Higgs Trucking, LLC, and hauls cargo for motor-carrier companies. Richard Bailey is the owner of Express Auto Transport, Inc., a motor-carrier company.

In 2019, Higgs and Bailey executed a lease agreement under which Higgs and Higgs Trucking, LLC, (Plaintiffs) would lease a tractor-trailer and provide driving services for Bailey and Express Auto Transport, Inc. (Defendants), in return for compensation. (Compl. ¶¶ 10–11, 13). That lease was subject to the so-called Truth in Leasing regulations, 49 C.F.R. Part 376, which the Department of Transportation promulgated pursuant to the Truth in Leasing Act, 49 U.S.C. § 10704(a)(1). For convenience, I'll generally refer to the Truth in Leasing regulations as "the regulations" and the Truth in Leasing Act as "the Act."

Plaintiffs and Defendants worked together under the lease for about four-and-a-half years. Then the relationship broke down.

In 2025, Plaintiffs sued Defendants. Plaintiffs alleged that Defendant Express Auto is liable under the Act for violating certain regulations (Count One) and is liable for breaching the parties' lease agreement (Count Two). Plaintiffs now move for partial summary judgment as to liability on Counts One and Two.[1] I grant in part and deny in part the motion.

## I

John Higgs and Richard Bailey agreed that Higgs—a truck driver by trade—would lease a tractor-trailer and provide driving services to transport vehicles for Bailey's motor-carrier company, Express Auto, in exchange for compensation. Bailey supplied a form lease agreement to Higgs, and they both signed it on October 7, 2019.[2] .

Section 3 of the lease agreement explains that Express Auto could pay Plaintiffs in one of three ways—either a fixed payment schedule ("first payment scheme"), a trip-specific schedule communicated in writing ahead of each trip ("second payment scheme"), or a percentage of gross revenue ("third payment scheme"):

---

[1] Plaintiffs' complaint asserts two additional claims against both Defendants, which are not included in this motion.

[2] The lease agreement refers to Defendants as "carrier" and Plaintiffs as "contractor."

> For the full and proper performance of each trip made by the CONTRACTOR under the terms of this Agreement, the CARRIER agrees[] to pay CONTRACTOR in accordance with the established schedule of rates and charges for particular shipments ***or*** in accordance with such terms as have been agreed between CARRIER and CONTRACTOR in writing prior to the commencement of each shipment. ***If*** no specific rates have been established or agreed upon, CARRIER shall pay CONTRACTOR as follows[:] 15% of the gross revenue received from all transportation performed by CONTRACTOR with said vehicle in the transportation of freight regulated by the Interstate Commerce Commission, intrastate freight, and freight which is exempt from economic regulation.

(Higgs Decl. (Dkt. No. 31), Ex. 1 ¶ 3 (emphasis added).) The parties agree that they did not exercise the first payment scheme. They disagree about which of the other two they exercised.

The third payment scheme deserves further attention given the issues here. Under this scheme, the lease agreement clearly states that compensation would be "15%" of the gross revenue. (*Id.*) The parties agree that this was an error; they mutually understood that Defendants would pay Plaintiffs 85% of gross revenue under this scheme. (*See* Pl. Mem. (Dkt. No. 29), at 3; Def. Mem. (Dkt. No. 35), at 3, 2, 5, 10.)

The lease agreement laid out several additional terms specific to the third payment scheme:

- It defined "the term 'gross revenue' [as] the net revenue received by CARRIER from its customer (whether shipper, broker, or other entity)." (Higgs Decl., Ex. 1, ¶ 3(A).)

- It defined "the term 'net revenue' as used in this Agreement [as] that revenue obtained by or due CARRIER from its customer or broker for the transportation performed by CONTRACTOR'S vehicles, less any collection cost or expense that reduces the net received for services performed." (*Id.* ¶ 3(H).)

- And it stated: "If CONTRACTOR is compensated on the basis of a percentage of gross revenue for a shipment, CONTRACTOR will, at CONTRACTOR'S request, be given a copy of the rated freight bill or other shipping documentation at the time of settlement[.]" (*Id.* ¶ 12.)

Regardless of which payment scheme was used, Section 3(D) of the lease agreement stated that Express Auto was authorized to deduct from Plaintiffs' compensation any advance payments that they provided to Plaintiffs for enumerated items, including fuel, repairs, and payments due to Express Auto pursuant to any agreements between the parties. (*Id.* ¶ 3(D)(1)–(7).) For any such deductions, the lease specified that Express Auto had to first provide Plaintiffs with a written explanation and itemization. (*Id.* ¶ 3(F).)

The parties agree that their course of conduct was as follows: Express Auto would dispatch Plaintiffs for a trip by sending a "contract and manifest" describing shipping and delivery locations, the automobiles to be transported,

the rate per vehicle, and the "total for load" in a dollar amount.[3] (*See* Higgs Decl., Ex. 2, at 1; Ex. 3, at 1; Ex. 4, at 1; Ex. 5, at 1; Ex. 6, at 1; Ex. 7, at 1.) The manifests didn't state that Plaintiffs would receive 85% of the "total for load." (*Id.*) After the trip, Express Auto would send a "trip settlement" that showed the same "total for load" amount as in the manifest, less 15%, and less other charges. (*See id.*, Ex. 3, at 4–5; Reddall Decl. (Dkt. No. 37), Ex. 2, at 117, 120, 122.) One exemplar trip settlement shows fuel and "port escort" deductions (Reddall Decl., Ex. 2, at 117.); others show deductions for fuel and monthly payments toward the truck ("TK")[4] (*Id.* at 120, 122); still another shows deductions for fuel and insurance (Higgs Decl., Ex. 3, at 5.). Express Auto sent customer invoices—which the parties agree are the same as "rated freight bills"—to its client companies. (Higgs Decl., Ex. 3, at 2; Ex. 4, at 2; Ex. 5, at 2–3; Ex. 6, at 2; Ex. 7, at 2.) It did not send copies to Plaintiffs.

Plaintiffs seek summary judgment on claims that Express Auto violated regulations governing compensation, rated freight bills, and charge-backs and breached lease terms regarding rated freight bills and charge-backs.

---

[3] I'll refer to the "contract and manifest" as a "manifest." The manifests refer to Plaintiffs as "carrier" and Defendants as "broker agent."

[4] Around the same time that they signed the lease, the parties executed a promissory note under which Plaintiffs would buy a tractor-trailer from Defendants, to be paid over time through an escrow account.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one whose resolution may affect the suit's outcome under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-movant based on the evidence. *Id.* Thus, a court must inquire whether the evidence presents sufficient disagreement to require the submission of the case to a jury or whether it's so one-sided that one party must prevail as a matter of law. *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005). The court must believe the non-movant's evidence and draw all justifiable inferences in that party's favor. *Anderson*, 477 U.S. at 255.

### A. Count One: Liability under the Act for regulatory violations.

Plaintiffs move for partial summary judgment as to liability on Count One of their complaint, which claims that Express Auto is liable under the Truth in Leasing Act because the lease violates the Truth in Leasing regulations. There is no dispute that the regulations govern the lease here.

The Act and the regulations provide protections to individual truckers (sometimes called "owner-operators") who lease their trucks to carrier companies to haul cargo. The "primary goal" of the Act is "to prevent large

carriers from taking advantage of individual owner-operators due to their weak bargaining position." *Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc. (AZ)*, 367 F.3d 1108, 1110 (9th Cir. 2004). The regulations are designed "to promote truth-in-leasing—a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; . . . .to eliminate or reduce opportunities for skimming and other illegal or inequitable practices [by motor carriers]; and . . . to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry." *In re Arctic Exp. Inc.*, 636 F.3d 781, 796 (6th Cir. 2011) (quoting *Owner-Operator Indep. Drivers Ass'n, Inc. v. Ledar Transp.*, No. 00-cv-258-W-2-ECF, 2000 WL 33711271, at *3 (W.D. Mo. Nov. 3, 2000)); *see also Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1211 (10th Cir. 2016).

To enforce these protections, the Act states: "a person injured because a carrier . . . providing transportation or service subject to jurisdiction under chapter 135 [of this Title] does not obey an order of the Secretary or the Board, as applicable, under this part, except an order for the payment of money, may bring a civil action to enforce that order under this section." 49 U.S.C. § 14704(a). The Eighth Circuit recognizes that the Act creates a private right of action for regulatory violations. *Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC*, 556 F.3d 690, 692 (8th Cir. 2009).

To implement the Act, the regulations set out formal requirements for lease agreements between owner-operators and carriers. 49 C.F.R. § 376.12(a)–(m). The regulations preface these formal requirements with the statement: "the required lease provisions shall be adhered to and performed by the authorized carrier." 49 C.F.R. § 376.12. Courts have interpreted this statement as requiring not just the lease agreement's formal compliance with the regulations but also the parties' "compliance with the lease's terms." *Mervyn v. Nelson Westerberg, Inc.*, 76 F. Supp. 3d 715, 718 (N.D. Ill. 2014); *cf. Owner-Operator Indep. Drivers Ass'n, Inc. v. Ledar Transp.*, No. 00-cv-0258-W-FJG, 2004 WL 5249148, at *7 (W.D. Mo. Dec. 30, 2004) (finding defendants violated regulation by requiring drivers to buy things from them even though the lease said this would not be required).

Plaintiffs' complaint alleges that Express Auto violated the regulations. (*See* Compl. (Dkt. No. 1) ¶¶ 19–41.) They move for summary judgment as to alleged regulatory violations of lease requirements governing compensation terms (49 C.F.R. § 376.12(d)); requiring carriers to provide copies of rated freight bills (§ 376.12(g)); and requiring specification and itemization of charge-back items (§ 376.12(h)).

Plaintiffs move for summary judgment only as to liability, not damages. But I want to be clear about the impact of my ruling on any potential damages. For several of Plaintiffs' claims, that impact depends on the outcome of a threshold question: did the parties exercise the third payment scheme (percentage of gross revenue) under the lease, as Plaintiffs claim, or did they exercise the second payment scheme (pre-trip agreement), as Defendants claim?

Plaintiffs claim Express Auto compensated them under the third payment scheme because each trip settlement reflected a 15% deduction from the total load amount (or revenue) set out in the manifest. On that premise, Plaintiffs claim Express Auto violated the regulations because the lease did not clearly define "revenue" and because Express Auto didn't provide rated freight bills, which would have shown that Express Auto billed its customers more money ("revenue") than the manifests and trip settlements reflected. Indeed, the rated freight bills in the record do indicate that Express Auto charged its customers more money than manifests and trip settlements reflected. It is undisputed that Express Auto paid Plaintiffs 85 % of the amount reflected in the manifests and trip settlements and not of the greater amount reflected in the rated freight bills. But any potential damages caused by this difference would come into play only if the parties exercised the third payment scheme.

Defendants, on the other hand, claim Express Auto exercised the second payment scheme because it sent manifests to Plaintiffs before each trip. The second payment scheme doesn't tie compensation to a percentage of revenue. Unlike the trip settlements, the manifests—the pre-trip document received by Plaintiffs—do not state the percentage Plaintiffs should receive for the load.

If Defendants are correct and the parties exercised the second payment scheme, then the ambiguity of the revenue terms and the difference between the manifests and trip settlements on the one hand and the rated freight bills on the other hand become irrelevant. That's because Plaintiffs would be unable to establish damages based on the terms' ambiguity or the difference between the documents.

But it's an unsettled question. From my review of the record, it appears that the parties may have been operating under some combination of the second and third payment schemes. In any event, this threshold question presents a genuine issue of material fact for the jury. With that understanding, I'll turn to Plaintiffs' specific arguments related to liability under Count One.

**1. Section 376.12(d).**

Section § 376.12(d) requires the lease agreement between a carrier and driver to specify terms of compensation:

> The amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease . . . . The amount to be paid may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease.

49 C.F.R. § 376.12(d).

Plaintiffs argue that the lease agreement violated this 'clear-statement-of-compensation' regulation "to the extent either or both 'gross revenue' and 'net revenue' are ambiguous." (Pl. Mem. (Dkt. No. 29), at 9.) Defendants dispute the terms' ambiguity.

As stated, the question as to the revenue terms' ambiguity is relevant to damages only if the parties exercised the third payment scheme. That's because only the third payment scheme makes compensation contingent on a percentage of gross revenue, which the lease defines by reference to net revenue. Assuming that the parties indeed exercised the third payment scheme, I find that the term "net revenue" is ambiguous and that this ambiguity is carried into the definition of "gross revenue" by reference.

The lease defines "gross revenue" as "the net revenue received by CARRIER from its customer (whether shipper broker, or other entity." (Higgs Decl., Ex. 1, ¶ 3(A).) The lease defines "net revenue" as "that revenue obtained by or due CARRIER from its customer or broker for the transportation performed by CONTRCTOR'S vehicles, *less any collection cost or expense* that reduces the net received for services performed." (*Id.* ¶ 3(H) (emphasis added).) But the lease does not define "collection cost or expense." This is where the problem lies. That lack of definition makes both the terms "net revenue" and "gross revenue" ambiguous. And that ambiguity renders Plaintiffs' compensation not "clearly stated on the face of the lease," in violation of § 376.12(d). Plaintiffs' motion is granted as to this issue.[5]

[5] *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Landstar Sys., Inc.*, 622 F.3d 1307, 1317–18 (11th Cir. 2010) (holding that lease referencing possible payment reductions only in broad terms violates § 376.12(d)'s specificity requirement); *Owner–Operator Indep. Drivers Ass'n v. Bulkmatic Tr. Co.*, 503 F. Supp. 2d 961, 969 (N.D. Ill. 2007) (finding lease unlawfully ambiguous under § 376.12(d) because it failed to "specifically state which items, if any, may be excluded from gross revenue before calculating owner-operator compensation"); *Niiranen v. Carrier One, Inc.*, No. 20-CV-06781, 2025 WL 885701, at *8 (N.D. Ill. Mar. 22, 2025) ("Multiple courts have found that, where a lease expresses a driver's compensation as a percentage of gross revenue, the carrier's failure to 'clearly explain how [it] arrives at its figure for gross revenue' violates § 376.12(d).") (quoting *Cunningham v. Lund Trucking Co.*, 662 F. Supp. 2d 1262, 1272 (D. Or. 2009), and citing *Bulkmatic*, 503 F. Supp. 2d at 969–70); *Port Drivers Fed'n 18, Inc. v. All Saints Exp., Inc.*, 757 F. Supp. 2d 443, 453 (D.N.J. 2010) (granting summary judgment to plaintiffs on finding that leases violated § 376.12(d) by failing to state the amount to be paid on the face of the agreements).

**2. Section 376.12(g).**

Section 376.12(g) states:

> When a lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, before or at the time of settlement, a copy of the rated freight bill, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill.

49 C.F.R. § 376.12(g). This regulation thus creates a "disclosure mandate that protects owner-operators by requiring that the lease disclose the availability of information useful to ensure the carrier does not shortchange the driver at settlement. The lease must specify when this information is to be made available, and then the carrier must provide it or be in breach of contract." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 679 (7th Cir. 2022).

Here, the lease provides: "If CONTRACTOR is compensated on the basis of a percentage of gross revenue for a shipment, CONTRACTOR will, at CONTRACTOR'S request, be given a copy of the rated freight bill or other shipping documentation at the time of settlement[.]" (Higgs Decl., Ex. 1 ¶ 12.)[6]

---

[6] Plaintiffs don't argue that the lease agreement violates the regulation by adding a contingency that contractor request the documents, although the addition would seem to reduce the regulation's intended protection for drivers.

Plaintiffs argue—and Express Auto doesn't dispute—that Express Auto failed to provide Plaintiffs with rated freight bills at or before settlement as the regulation plainly requires.[7] That should be dispositive. However, this lease provision includes a condition precedent that compensation be based on a percentage of gross revenue. As discussed, it is a disputed material fact whether the parties agreed that compensation was based on percentage of gross revenue under the third payment scheme. Because I can't determine this threshold issue, I can't conclude that there was a violation of this regulatory provision. Plaintiffs' motion is denied on this ground.[8]

---

[7] Notwithstanding the request requirement introduced by the lease but missing from § 376.12(g), Express Auto did not provide record evidence that it gave Plaintiffs copies of the rated freight bills at or before settlement as the regulation requires. Nor do they argue that the trip-settlement documents are sufficient to qualify as some "other shipping document" in satisfaction of this provision of the lease agreement. Given that the trip-settlement documents reflect a lower amount than the rated freight bills now part of the record, it doesn't appear that such an argument would hold water. (*Compare* trip settlements (Higgs Decl., Ex. 3, at 4–5; Reddall Decl., Ex. 2, at 117, 120, 122), *with* rated freight bills (Higgs Decl., Ex. 3, at 2; Ex. 4, at 2; Ex. 5, at 2–3; Ex. 6, at 2; Ex. 7, at 2.)

[8] *Cf. Cervantes v. CRST Int'l, Inc.*, No. 20-CV-75-CJW-KEM, 2024 WL 2732275, at *26–27 (N.D. Iowa May 28, 2024), *reconsideration denied*, No. 20-CV-75-CJW-KEM, 2024 WL 4016764 (N.D. Iowa Aug. 8, 2024) (finding no genuine issue of material fact as to defendant's liability for violating § 376.12(g) when settlement statements defendant gave drivers did not include the freight bill or other documentation containing the same information, but determining that amount of damages was triable issue).

**3. Section 376.12(h).**

A lease must "clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed." 49 C.F.R. § 376.12(h).

The lease agreement here required that Express Auto, "before deducting such payment, provide [Plaintiffs] with a written explanation and itemization of such deductions." (Higgs Decl., Ex. 1, ¶ 3(F).)

Plaintiffs allege that Express Auto violated § 376.12(h) in three ways:

- "by deducting compensation of money owed to the Plaintiffs for charge back items not specified in the lease, including escrow payments, vehicle maintenance, repair bills, fuel, and insurance payments" (Compl. ¶ 29);

- by "not provid[ing] Plaintiffs, as a lessor [*sic*], with copies of those documents which were necessary to determine the validity of charge-back items, including chargebacks [*sic*] for the escrow payments, vehicle maintenance, repair bills, fuel, and insurance" (*Id.* ¶ 30); and

- "by charging Plaintiffs an undisclosed and secret surcharge for fuel, without Plaintiffs' knowledge and approval, and by failing to provide Plaintiffs with copies of documents necessary to determine the validity of this secret surcharge" (*Id.* ¶ 31).

Express Auto provided Plaintiffs with trip settlements that included deductions for things like fuel, insurance, and escrow payments. (*E.g.*, Reddall Decl., Ex. 2, at 117, 120, 122; Higgs Decl., Ex. 3, at 5.) But nothing in the record indicates that Express Auto told Plaintiffs in writing how these deductions were computed. In fact, the record indicates that Express Auto may have folded repair costs into escrow-payment deductions without specifically breaking down that computation. (Reddall Decl., Ex. 2, at 13–14.) At oral argument, defense counsel explained that Express Auto didn't provide such recitation because it believed Higgs already had the information.

Express Auto's failure to provide Plaintiffs with clear recitation of its deduction computations violates the regulation.[9] I therefore grant summary judgment against Express Auto as to this issue.

**B. Count Two: Breach of the lease agreement.**

Count Two of Plaintiffs' complaint alleges that Express Auto breached the lease agreement in two ways: first, by failing to provide rated freight bills; second, by failing to provide specification as to charge-backs.

---

[9] *See Owner-Operator Indep. Drivers Assoc., Inc. v. C.R. England, Inc.*, 508 F. Supp. 2d 972, 981–82 (D. Utah 2007) (finding violation of § 376.12(h) where defendant failed to clearly specify certain charge-backs against compensation, including charges for fuel, repairs, tires, and fees, failed to include a recitation as to how the amount of charge-backs was calculated, and failed to provide plaintiffs with copies of documents necessary to determine the validity of the charge-backs).

Summary judgment on a breach-of-contract claim is warranted if there is no genuine factual dispute that a valid and enforceable contract exists, plaintiffs performed, defendants breached, and plaintiffs were injured. Here, there's no dispute that a valid contract existed and that Plaintiffs performed. As discussed, the damages element is not before me on this partial motion. The third element—breach—requires more analysis.

**1. Rated freight bills.**

The lease requires Express Auto to give Plaintiffs "a copy of the rated freight bill or other shipping documentation at the time of settlement . . . *if* [Plaintiffs are] compensated on the basis of a percentage of gross revenue for a shipment." (Higgs Decl., Ex. 1, ¶ 12 (emphasis added).) Plaintiffs allege that Express Auto breached the agreement by failing to provide this documentation. They seek summary judgment on this issue.

As described above, the lease requires Express Auto to provide copies of the rated freight bills only if the parties agreed to exercise the third payment scheme. And, as explained, there's a genuine and material factual dispute on that threshold question. This breach issue therefore depends on the jury's resolution of which payment option applied. If the jury determines that the parties agreed to operate under the third payment scheme, the contract was breached. Plaintiffs present clear records demonstrating that the manifests and settlements that Express Auto sent them were not the same as the rated

freight bills that Express Auto sent its customers. (*Compare* manifests (Higgs Decl., Ex. 2, at 1; Ex. 3, at 1; Ex. 4, at 1; Ex. 5, at 1; Ex. 6, at 1; Ex. 7, at 1) and trip settlements (*id.*, Ex. 3, at 4–5; Reddall Decl., Ex. 2, at 117, 120, 122), *with* rated freight bills (Higgs Decl., Ex. 3, at 2; Ex. 4, at 2; Ex. 5, at 2–3; Ex. 6, at 2; Ex. 7, at 2.) Express Auto admits it did not provide the rated freight bills and doesn't argue that the trip-settlement documents somehow qualify as some "other shipping document" in satisfaction of the lease. Thus, Plaintiffs did not receive "a copy of the rated freight bill or other shipping documentation at the time of settlement" as required under the agreement. Still, I must deny Plaintiffs' motion for summary judgment as to this claim due to the disputed facts surrounding the applicable payment terms.

**2. Charge-backs.**

The lease requires Express Auto to, "before deducting such payment, provide [Plaintiffs] with a written explanation and itemization of such deductions." (Higgs Decl., Ex. 1, ¶ 3(F).) Plaintiffs argue that Express Auto breached this provision "by deducting compensation of money owed to the Plaintiffs for charge back items not specified in the Lease, including escrow payments, vehicle maintenance, repair bills, fuel, and insurance payments." (Compl. ¶ 45.) Even assuming that the lease generally permits deductions for these items, it's undisputed that Express Auto failed to provide written explanation and itemization of the deductions as the lease required.

As discussed above, Express Auto did not file any documents or testimony showing that it provided an explanation or itemization on charge-backs to Plaintiffs. In fact, the deposition testimony that Express Auto filed in the record indicates that Plaintiff Higgs never saw some of the repair bills that were deducted from his pay: During his deposition, Higgs testified that Express Auto charged him for repairs that never happened and then "took the money out of my escrow, but I never got a receipt or a bill for it." (Reddall Decl., Ex. 2 (Dkt. No. 37-2) at 13–14.) Express Auto points to nothing in the record to rebut this alleged failure or otherwise create a disputed fact. Thus, Plaintiffs' motion for summary judgment is granted as to this issue.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that:

- Plaintiffs' motion for partial summary judgment (Dkt. No. 27) is **GRANTED IN PART** against Defendant Express Auto as to the Count One arguments under 49 C.F.R. § 376.12(d) and (h) and the charge-back lease provision of Count Two.
- Plaintiffs' motion for partial summary judgment is **DENIED IN PART** as to the Count One argument under 49 C.F.R. § 376.12(g) and the rated-freight bill argument under Count Two.

Date: September 25, 2026

*s/ Elsa M. Bullard*
Elsa M. Bullard
United States Magistrate Judge